E-FILED
Thursday, 21 March, 2019  09:05:53 PM
Clerk, U.S. District Court, ILCD

# Exhibit 1

Firm ID 31593

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS - URBANA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-02054 |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | Honorable Colin S. Bruce |
| UNIVERSITY OF ILLINOIS, | ) | Magistrate Eric I. Long |
| | ) | |
| Defendant. | ) | |
| | ) | |

### AFFIDAVIT OF JUSTIN BROWN

I, Justin Brown, do hereby swear upon my oath that the following statements are true and correct to the best of my knowledge, information and belief, and that I could competently testify as follows if called upon to do so:

1.      Since August 1, 2015, I have served in the positions of Associate Dean of Students at the University of Illinois Urbana Champaign (the "University") and Director of the University's Office for Student Conflict Resolution ("OSCR"). After the creation of the Title IX and Disability Office in spring 2017, I was also named a Deputy Title IX Coordinator. In my roles as Director of the OSCR and Deputy Title IX Coordinator, I am responsible for overseeing the University's investigation and resolution of complaints brought against students that include allegations of sexual misconduct, including sexual assault.

2.      As part of this oversight, I have access to and responsibility for maintaining documents related to the University's investigation and resolution of such complaints. I accordingly have personal knowledge of the University's investigation and resolution of the complaint of sexual assault made against the Plaintiff in this matter, John Doe ("Doe"), on June 4, 2018 by Jane Roe, a fellow student ("Roe").

1

3.      In my roles as Associate Dean of Students and Director of the OSCR, I am one of the University officials responsible for the administration and enforcement of the University's Student Code ("Code") Sexual Misconduct Policy ("Policy"), Student Disciplinary Procedures, and Student Conduct Protocol for Allegations of Sexual Misconduct, Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence ("Protocol"). As such, I have personal knowledge of the Code, the Policy, the Student Disciplinary Procedures, and the Protocol.

4.      Among other things, the Code includes descriptions of academic requirements relating to graduation and the conferral of degrees. It provides that the University may withhold conferring a degree pending ongoing disciplinary procedures that extend beyond a student's completion of academic work. A true and correct copy of the relevant sections of the Code in effect at times relevant to this matter is included at **Attachment A**.

5.      The Code also informs students that they will be subject to discipline for conduct that violates the Policy, including sexual assault.

6.      Among other things, the Student Disciplinary Procedures provide that the University may withhold awarding a student's degree while discipline is pending. A true and correct copy of the relevant sections of the Student Disciplinary Procedures in effect at times relevant to this matter  is included at **Attachment B**.

7.      Since the time of the resolution of Roe's complaint against Doe, the University has revised the Protocol. The Protocol now includes the opportunity for the parties in a sexual misconduct proceeding to present testimony directly to the hearing panel.

2

8.     The Code and the Student Disciplinary Procedures require that any disciplinary charges against a student for which dismissal is a possibility be resolved, and that the student's record be free of active suspension or dismissal sanctions, to confer a student's degree.

9.     Accordingly, as required by the Code and Student Disciplinary Procedures, when the University received the sexual assault complaint against Doe on June 4, 2018, the University placed a disciplinary hold on Doe's record to withhold the conferral of his degree pending the resolution of that complaint and the determination of any sanctions. The University notified Doe on June 4, 2018 that a disciplinary hold had been placed on his account which restricted him from graduating from the University.

10.     With regard to the investigation into Roe's complaint, the investigators, January Boten and Debra Imel conducted interviews of witnesses and reviewed electronic communications between and/or involving Doe and Roe.

11.     The final investigation report that the investigators compiled and submitted to the hearing panel included 284 pages. It included summaries of interviews with Doe, Roe, and seven witnesses; extensive electronic and social media communications between Doe and Roe and between Doe or Roe and other individuals; documents from Doe's counselors and employer; and communications between Doe and Roe's boyfriend. It also included written responses by Doe and Roe to the initial and revised investigation reports, including questions both parties submitted for the investigators to ask the other party and summaries of additional interviews with Doe and Roe in which they were asked and discussed these questions.

12.     In addition, the hearing panel was also provided and considered written impact statements submitted by Doe and Roe and character reference letters submitted by Doe.

3

13.     On September 27, 2018, the hearing panel determined that Doe did not demonstrate that he had consent for any of the three sexual encounters with Roe that occurred on the night at issue due to Roe's incapacitation due to alcohol, and was accordingly responsible for sexual assault under the Policy. The panel imposed a sanction of dismissal from the University for two years.

14.     On October 25, 2018, a three-member appellate committee determined that the first hearing was not conducted fairly or in conformity with University procedures because the panel did not sufficiently explain its rationale for the finding of responsibility for a violation of the Policy with regard to the first two sexual encounters. The appellate committee granted Doe's appeal and remanded the matter for a new determination by a new panel.

15.     On November 12, 2018, a second panel determined, after a complete examination of the information presented, that Roe had been incapacitated and unable to provide consent the third time she had sexual intercourse with Doe. With regard to the first two instances of sexual intercourse, the second panel noted that Doe and Roe had consumed alcohol throughout the evening at issue; Doe acknowledged Roe became drunk and confirmed that at one point she began to cry and get emotional; afterwards, they engaged in sexual intercourse twice; and Roe stated she was incapacitated during these acts. The second panel found that there was insufficient evidence to demonstrate that Doe should have reasonably known that Roe was incapacitated during these two acts.

16.     The second panel noted that after the second encounter, Roe finished the alcohol she had and then vomited on herself and on the bed; Doe had told investigators that he was concerned for her, engaged in efforts to comfort her, and assisted in taking her to the bathroom; and two hours later, Doe engaged in sexual activity with Roe.

17.     The second panel found that:

4

Given that [Roe] vomited and had to be helped to the bathroom the subcommittee believes that [Roe] was incapacitated during the third sexual encounter and that [Doe] should have reasonably known. Specifically, [Doe] acknowledges concern[] for [Roe's] well-being after she vomited and he should have known at this point [Roe] was not able to provide consent for sexual activity. [Doe] states that the third sexual act happened two hours later and that [Roe] was awake. The subcommittee finds that given the amount alcohol that [Roe] consumed this was insufficient time for her to regain capacity.

18.     The second panel accordingly found that Doe was responsible for sexual assault in violation of Code §1.302.b.1, and imposed the sanction of dismissal.

19.     Doe appealed the second panel's decision. On approximately December 10, 2018, the appellate committee reviewed and upheld the second panel's findings and sanction.

20.     Pursuant to the Code and Student Disciplinary Procedures, the University has withheld conferring Doe's degree based on the determination that he was responsible for sexual assault and his dismissal.

21.     Doe will be permitted to petition for the conferral of his degree in spring 2020.

FURTHER AFFIANT SAYETH NAUGHT.

Justin Brown

Subscribed and sworn to before
me this  2\  day of March, 2019.

Notary Public

OFFICIAL SEAL
JESSICA STEENBERGEN
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires Nov 4, 2019

5

# Attachment A



# STUDENT CODE

2 0 1 7 - 2 0 1 8

University of Illinois at Urbana-Champaign



# PREFACE

The *Student Code* is divided into three articles:

Article 1 (Student Rights and Responsibilities)
Article 2 (General Policies and Regulations)
Article 3 (Academic Policies and Regulations)

The symbol § means section.
Unless otherwise noted, the rules stated in this *Student Code* apply to all undergraduate, graduate, and professional students enrolled at the University of Illinois at Urbana-Champaign. A printed booklet containing only Article 1 (Student Rights and Responsibilities) is also available.

The most current version of the *Student Code* is always available online at **studentcode.illinois.edu.** The print version may not reflect the most recent changes to the *Student Code.*

i

## PROCEDURE FOR AMENDING THE *STUDENT CODE*

The Conference on Conduct Governance (CCG) is a standing committee of the Urbana-Champaign Senate composed of faculty members, administrators, and students. Its responsibilities are outlined in the Senate Bylaws, which provide in relevant part:

(a) Duties

Legislative Function of the Conference—The Conference is a Senate Committee which, in conjunction with the Chancellor and with the assistance of the Office of Campus Regulations, shall have the following legislative functions:

(1) Review and transmit in writing to the Chancellor its approval, disapproval, or modification of standards of conduct (hereafter called "rules") initiated by subcommunities of the campus;

(2) Initiate and recommend in writing to the Chancellor adoption of additional rules it deems desirable;

(3) File with the Office of Campus Regulations and with the Clerk of the Senate a notice of such transmittals and recommendations including the text of the rules; and

(4) Periodically review the conduct governance system and make general recommendations to the Chancellor and the Senate regarding revision of the system. To this end, it may request reports from members of the system.

(b) Authority and Jurisdiction

(1) Rules filed with the Office of Campus Regulations and with the Clerk of the Senate shall become effective thirty (30) days after filing unless contrary action has been taken by the Chancellor. The Senate may submit its recommendations to the Chancellor with respect to proposed rule changes. To this end, the thirty (30) day period may be extended by the Senate or Senate Executive Committee to ninety (90) days, excluding the period May 21 through August 20, .…

As outlined above, CCG is responsible for drafting amendments to the *Student Code*, subject to final approval by the Chancellor. Proposed amendments come from many sources. For example, CCG itself generates many proposals in exercising its oversight function stated in the Senate Bylaws. Suggested amendments also have come from students, faculty members, and campus academic and administrative units. In addition, the Chancellor, the Dean of

Students, and other campus administrators periodically appoint campus task forces to study specific issues and make recommendations that ultimately require amendments to the *Student Code*.

All proposals to amend the *Student Code*, both internal and external, are assigned an agenda item number by the CCG Chair and scheduled for discussion at one or more regularly scheduled CCG meetings. Many agenda items require significant additional discussion with the proposing party and other members of the campus community who may be affected by the proposed change.

If CCG votes to recommend a change, draft language is prepared. Merely technical or noncontroversial changes are sent directly to the Chancellor for approval. More significant or controversial changes are presented by the CCG Chair for comment to the Senate Executive Committee and later to the full Senate. Typically, additional changes are made to the draft in response to Senate Executive Committee and Senate comments before it is sent to the Chancellor for approval.

Note that for most *Student Code* changes, the Senate's role is advisory to the Chancellor. Some changes, however, (for example, those related to academic issues) require a formal Senate vote of approval before they are added to the *Student Code*.

Once an agenda item has been approved by the Chancellor (or if necessary, by the Senate), it is scheduled for inclusion in the Student Code text. Although a change may become effective immediately upon approval, most changes are held until the end of the academic year for inclusion in the following year's *Student Code*. This process allows people who use the *Student Code* to rely upon the most recent printed version as stating the current rules.

# CONTENTS

■

ARTICLE I—STUDENT RIGHTS AND RESPONSIBILITIES

**PART 1. STUDENT RIGHTS**

1-101   Preamble ....................................................................................1
1-102   In the Classroom...........................................................................1
1-103   Campus Expression........................................................................2
1-104   Privacy ......................................................................................2
1-105   Student Records............................................................................3
1-106   Student Affairs..............................................................................3
1-107   Religious Beliefs, Observances, and Practices.......................................4
1-108   Nondiscrimination Policy ................................................................4
1-109   Statement on Consenting Sexual Relationships.....................................5
1-110   Policy for the Provision of Reasonable Accommodations for Students
        with Disabilities ...........................................................................5
1-111   Sexual Misconduct Policy ...............................................................6

**PART 2. GENERAL RESPONSIBILITIES OF STUDENTS**

1-201   Responsibilities of Students...............................................................8

**PART 3. STUDENT DISCIPLINE**

1-301   Basis for Discipline—Source and Jurisdiction.......................................8
1-302   Rules of Conduct..........................................................................10
1-303   Falsification of Documents..............................................................12
1-304   Identification Cards.......................................................................12
1-305   Policy on Drugs ...........................................................................13
1-306   Alcoholic Beverages—Preamble ......................................................14
1-307   Alcoholic Beverages—General Rules .................................................14
1-308   Alcoholic Beverages—Special Rules Relating to University Property.............15
1-309   Possession or Storage of Weapons....................................................15
1-310   Unauthorized Use, Abuse, or Interference with Fire Protection
        Equipment, Building Security Systems, Security or
        Fire Personnel, or Warning Devices...................................................16
1-311   Certain Consequences of Disciplinary Action.......................................16

v

**PART 4. UNIVERSITY PROPERTY AND FACILITIES—IN GENERAL**
2-401 Pets and Animals on University Property ................................ 42
2-402 Library Regulations ............................................................. 43
2-403 Smoke-Free Campus Policy .................................................. 44
2-404 Chalking Policy ................................................................... 45
2-405 Picketing ............................................................................. 45
2-406 Solicitation and Commercial Activity in University Residence Halls ... 46
2-407 Posting and Distribution of Handout Materials ..................... 47

**PART 5. USE OF UNIVERSITY PREMISES AND FACILITIES**
2-501 Preamble ............................................................................. 48
2-502 Eligibility ............................................................................. 48
2-503 Reservation Procedures ....................................................... 48
2-504 The Priority System—Priorities for Use of Space ............... 49
2-505 Operation of the Priority System ........................................ 50
2-506 Requirements and Limitations ............................................. 51
2-507 Events Involving Professional Performers ........................... 53
2-508 Committee on the Use of Univ. Premises and Facilities........ 54
2-509 Special Provisions for Use of the Krannert Center for
the Performing Arts............................................................ 55
2-510 Special Provisions for Use of the State Farm Center ........... 55
2-511 Special Provisions for Use of the Beckman Institute for
Advanced Science and Technology ...................................... 57
2-512 Provisions for Use of the Allerton Park and Conference Center..... 58

**PART 6. MOTOR VEHICLES AND BICYCLES**
2-601 Operation of Motor Vehicles................................................ 58
2-602 Automobiles........................................................................ 59
2-603 Use of Motorcycles (Including Motor Scooters and Motor-Drive
Bicycles)............................................................................. 59
2-604 Parking Citations................................................................. 60
2-605 Operation of Bicycles.......................................................... 60
2-606 Use of In-Line Skates, Roller Skates, and Skateboards......... 60

**PART 7. CHANCELLOR'S EMERGENCY POWERS**
2-701 Basis for Chancellor's Emergency Powers .......................... 61

**PART 8. MISSING STUDENT NOTIFICATION POLICY**
2-801 Confidential Contact Identification....................................... 61
2-802 Reporting a Suspected Missing Student................................ 61
2-803 Handling............................................................................. 61

**PART 4. ACADEMIC INTEGRITY POLICY AND PROCEDURE**
1-401 Policy Statement; Application; Definitions............................ 17
1-402 Academic Integrity Infractions............................................. 17
1-403 Procedures.......................................................................... 19
1-404 Sanctions............................................................................ 23
1-405 Reporting and Record Keeping............................................. 23
1-406 Continuing Jurisdiction of the Senate Committee
on Student Discipline......................................................... 24

**PART 5. CLASS ATTENDANCE**
1-501 All Students......................................................................... 24
1-502 Student Athletes .................................................................. 26

**ARTICLE 2—GENERAL POLICIES AND REGULATIONS**

**PART 1. MEDICAL POLICIES**
2-101 Health Requirements ........................................................... 27
2-102 Mandatory Assessment ........................................................ 27
2-103 Student Health Insurance..................................................... 29
2-104 Policy for Individuals With Contagious Diseases................... 30
2-105 Policy and Procedures for Involuntary Withdrawal of
Students for Psychiatric Reasons ....................................... 30

**PART 2. HOUSING POLICIES**
2-201 Certified Single Student Housing.......................................... 31
2-202 Living Quarters of Students.................................................. 32

**PART 3. REGISTERED ORGANIZATIONS AND ORGANIZATION FUND**
2-301 Classification of Organizations............................................. 33
2-302 Preamble ............................................................................. 33
2-303 Requirements for Registration for Registered Organizations and
Registered Student Organizations......................................... 34
2-304 Sanctions of Registered Organizations.................................. 36
2-305 University Credit Policies...................................................... 36
2-306 Alcoholic Beverages Policies................................................ 36
2-307 Organization Fund............................................................... 37
2-308 Organization Fund—Purpose................................................ 37
2-309 Organization Fund—Status .................................................. 37
2-310 Organization Fund—Scope ................................................... 38
2-311 Organization Fund—Administration ...................................... 38
2-312 Purposes for Which Organization Funds May Be Used .......... 39
2-313 Procedures for Organization Fund Operations....................... 40
2-314 Withdrawal of Organization Fund Privileges.......................... 40
2-315 Dormant Accounts............................................................... 41
2-316 Organization Fund—Advisory Board ..................................... 41
2-317 Functions of the Organization Fund Advisory Board.............. 41
2-318 Annual Meetings.................................................................. 42

## ARTICLE 3—ACADEMIC POLICIES AND REGULATIONS

**PART 1. GRADES AND GRADING SYSTEM**
3-101 Academic Work Report Requirements.....63
3-102 Grading System—Grades Authorized for All Colleges.....63
3-103 Computation of Scholastic Averages.....63
3-104 Other Grade Symbols in Use.....64
3-105 Credit-No Credit Grading Options.....66
3-106 Grade Corrections.....67
3-107 Procedures for Review of Alleged Capricious Grading.....67
3-108 Academic Progress.....68
3-109 Probation and Drop Rules—Undergraduate Students.....68

**PART 2. EXAMINATIONS**
3-201 Final Examinations.....69
3-202 Evening, Midterm, and Hourly Examinations.....71
3-203 Proficiency Examinations.....72
3-204 Special Examinations.....73

**PART 3. REGISTRATION, COURSE CHANGES, AND WITHDRAWAL**
3-301 Number of Hours Required.....74
3-302 Classification of Undergraduate Students.....74
3-303 Registration.....75
3-304 Registration of Nondegree Students.....76
3-305 Registration of Auditors.....76
3-306 Payments.....77
3-307 Late Registration.....77
3-308 Cancellation of Registration.....78
3-309 Repeated Undergraduate Courses and Campus Grade Replacement.....78
3-310 Guided Individual Study, and Extramural and Online Courses.....79
3-311 Adding and Dropping Courses.....80
3-312 Withdrawal from the University—General Rules.....80
3-313 Withdrawal from the University for Military or Other National Defense Services.....81

**PART 4. UNDERGRADUATE ACADEMIC RECOGNITION**
3-401 The Dean's List.....82
3-402 Campus Honors Program—Chancellor's Scholars.....83
3-403 Edmund J. James Scholars.....83
3-404 University Honors—Bronze Tablet.....83
3-405 Undergraduate College Honors.....83

**PART 5. REGISTRATION CHARGES**
3-501 Tuition Assessment.....84
3-502 Tuition Assessment—University Employees.....84
3-503 Tuition Waivers.....85
3-504 Tuition—Waiver of Nonresident Portion.....87
3-505 Fee Assessments.....88
3-506 Fee Waivers and Exemptions.....90

3-507 Payment Requirement.....94
3-508 Refunds of Registration Charges.....94
3-509 Students in Debt to the University.....95

**PART 6. STUDENT RECORDS—GUIDELINES AND REGULATIONS GOVERNING ACCESS AND RELEASE**
3-601 Authorization and Responsibility for Policy Implementation.....95
3-602 Definitions.....96
3-603 Access to Student's Personally Identifiable Education Records.....97
3-604 Regulations for Record Custodians.....98
3-605 Classification, Locations, and Custodians of Student Records.....99
3-606 Procedures for Student Access and Challenge.....100
3-607 Chancellor's Hearing Panel.....100
3-608 Disposal of Inactive Records.....101
3-609 Release of Student Information and Academic Records by the Office of the Registrar.....101

**PART 7. TRANSCRIPTS**
3-701 Availability.....102
3-702 Information Appearing on All Transcripts.....102
3-703 Other Symbols Appearing on Transcripts.....103
3-704 Description and Definition of Information Appearing on Transcripts.....103

**PART 8. GRADUATION**
3-801 Credit Requirements for Degrees.....104
3-802 Minimum Scholarship Requirements for the Bachelor's Degree.....105

**PART 9. RESIDENCY STATUS REGULATIONS**
3-901 In General.....106
3-902 Regulations.....106
3-903 Factors in Determining Residency.....108
3-904 Procedures.....108

Definitions.....110
Acronyms.....111

## CAMPUS INTEGRITY STATEMENT

■

The University of Illinois at Urbana-Champaign expects its faculty, staff, students and guests to conduct themselves in accordance with the community values of civility, respect and honesty; to maintain the highest level of integrity and exercise critical judgment in all dealings, decisions and encounters; and to maintain and strengthen the public's trust and confidence in our institution.

# ARTICLE I—STUDENT RIGHTS AND RESPONSIBILITIES

## PART 1. STUDENT RIGHTS

### § 1-101   Preamble

(a)   A student at the University of Illinois at the Urbana-Champaign campus is a member of a University community of which all members have at least the rights and responsibilities common to all citizens, free from institutional censorship; affiliation with the University as a student does not diminish the rights or responsibilities held by a student or any other community member as a citizen of larger communities of the state, the nation, and the world.

(b)   Any rules or regulations considered necessary to govern the interaction of the members of the University community are intended to reflect values that community members must share in common if the purpose of the community to advance education and to enhance the educational development of students is to be fulfilled. These values include the freedom to learn, free and open expression within limits that do not interfere with the rights of others, free and disinterested inquiry, intellectual honesty, sustained and independent search for truth, the exercise of critical judgment, respect for the dignity of others, and personal and institutional openness to constructive change. The following enumeration of rights shall not be construed to deny or disparage other rights retained by these individuals in their capacity as members of the campus community or as citizens of the community at large.

### § 1-102   In the Classroom

The instructor, in the classroom and in conference, should encourage free discussion, inquiry, and expression. Student performance should not be evaluated on opinions or conduct in matters unrelated to academic standards.

(a)   Students should be free to take reasoned exception to the data or views offered in any course of study and to reserve judgment about matters of opinion, but they are responsible for learning the content of any course of study for which they are enrolled.

(b)   Students should have protection through orderly procedures against prejudiced or capricious academic evaluation. At the same time, they are responsible for maintaining standards of academic performance established for each course in which they are enrolled.

(c)   Information about student views, beliefs, and political associations that instructors acquire in the course of their work as instructors, advisers, and counselors should be considered confidential. Protection against improper disclosure is a serious professional obligation. Judgments of ability and character may be provided under appropriate circumstances, normally with the knowledge or consent of the student.

(d)   The instructor is in charge of the orderly conduct of the class and may exclude a student or an auditor who does not comply with a reasonable request in this regard. If the student is registered for the course and if the disruption is repeated or so egregious as to violate other conduct regulations, (usually § 1-302(f)), the instructor, after consultation with the department head or designee and the Executive Director of the Senate Committee on

1

Student Discipline, may exclude the student from the class until such time as the disciplinary matter has been resolved. If the disciplinary matter is resolved in a manner that permits the student to return to class, the instructor, in consultation with the department head and the Executive Director of the Senate Committee on Student Discipline or designee, shall decide whether and to what extent the student will be permitted to make up course work missed while excluded from class.

(c) Should a student feel that his or her rights as a student have been violated, the student may discuss the matter, to the extent possible, with his or her instructor in the relevant course. If a resolution cannot be reached, the student may contact the head of the department in which the course is being offered. If further assistance is needed, the student may contact the dean's office of the college offering the course. Assistance navigating the process is available through the Student Assistance Center in the Office of the Dean of Students at (217) 333-0050 or helpdean@illinois.edu Monday-Friday between the hours of 8:30 a.m. and 5:00 p.m.

§ I-103 Campus Expression

(a) Discussion and expression of all views is permitted within the University subject only to requirements for the maintenance of order. Support of any cause by orderly means that are not in violation of law and that do not disrupt the operation of the University nor interfere with the rights of others is permitted.

(b) Members and organizations in the University community may invite and hear any persons of their own choosing, subject only to reasonable requirements on time, place, and manner for use of University facilities.

(c) The campus press and media are to be free of censorship. The editors and managers shall not be arbitrarily suspended because of student, faculty, administration, alumni, or community disapproval of editorial policy or content.

(d) The right of peaceful protest is recognized within the University community. The University retains the right to assure the safety of individuals, the protection of property, and the continuity of the educational process.

(e) Lawful picketing and other forms of peaceful protest are permitted on University premises except that lawful picketing is permitted only out-of-doors.

§ I-104 Privacy

(a) Members of the University community have the same rights of privacy as other citizens and surrender none of those rights by becoming members of the academic community. These rights of privacy extend to residence hall living. Nothing in University regulations or contracts shall give University officials authority to consent to a search by police or other government officials of offices assigned or living quarters leased to individuals except in response to a properly executed search warrant or search incident to an arrest.

(b) When the University seeks access to an office assigned or living quarters leased to an individual to determine compliance with provisions of applicable multiple dwelling unit laws, ordinances, and regulations, or for improvement or repairs, the occupant shall be notified of such action not less than twenty-four hours in advance. There may be entry without notice in emergencies where imminent danger to life, safety, health, or property is reasonably feared and for custodial service.

(c) The University may not conduct or permit a search of an office assigned or living quarters leased to an individual except in response to a properly executed search warrant or search incident to an arrest.

(d) The University shall not regulate the social life of students or their organizations except as such regulations may apply to use of University premises, facilities, or premises approved for student residences. Additional regulations for living units may be made by a democratically constituted student government for the unit.

(e) The University shall not regulate the hours individuals may keep.

§ I-105 Student Records

(a) The University and its subdivisions should have a carefully considered policy as to the information which should be part of a student's permanent educational record and as to the conditions of its disclosure. To minimize the risk of improper disclosure, academic and disciplinary records are normally separate. (See, however, § 3-704(a).) Access to the student's own records and files is guaranteed to each individual and is subject only to reasonable regulation as to time, place, and supervision.

(b) Transcripts of academic records should contain only information about academic status and conditions relating to the student's eligibility for continuing registration on this campus. Information from disciplinary or counseling files should not be available to unauthorized persons on campus, or to any person off campus without the express consent of the subject involved, except in cases where the student is not competent to grant such consent. In such cases, information will be made available only where the safety of persons or property is involved. No records should be kept which reflect the political activities or beliefs of students.

(c) Provisions should also be made for periodic routine destruction of noncurrent disciplinary records. Administrative staff and faculty members should respect confidential information about students which they acquire in the course of their work.

(d) The records and files of individuals no longer at the University shall continue to be subject to the provisions of this document.

§ I-106 Student Affairs

In student affairs, certain standards must be maintained if the freedom of students is to be preserved.

(a) Freedom of Association

Students bring to the campus a variety of interests previously acquired and develop many new interests as members of the academic community. They should be free to organize and join associations to promote their common interests.

(1) The membership, policies, and actions of a Registered Organization and Registered Student Organization usually will be determined by the vote of only those persons who hold bona fide membership in the college or University community.

(2) Affiliation with an extramural organization should not of itself disqualify a student organization from institutional recognition.

(3) Registered Organizations and Registered Student Organizations are not required to have campus advisors. However, if they chose to have one, each organization should be free to choose its own advisor, and institutional recognition should not be withheld or withdrawn solely because of the inability of a student organization to secure an advisor. Campus advisors may advise organizations in the exercise of responsibility, but they should not have the authority to control the policy of such organizations.

(4) The name(s) and address(es) of an agent or agents, and/or officers of a Registered Organization and Registered Student Organization, are required as a condition of registration.

(5) Campus organizations, including those affiliated with an extramural organization, shall not discriminate against a member or prospective member on the basis of race, color, religion, sex, sexual orientation including gender identity, national origin, ancestry, age, marital status, disability, unfavorable discharge from the military, or status as a disabled veteran or veteran of the Vietnam era, except as specifically exempted by law.

(b) Freedom of Inquiry and Expression

(1) Students, Registered Organizations and Registered Student Organizations should be free to examine and to discuss all questions of interest to them, and to express opinions publicly and privately. They should always be free to support causes by orderly means which do not disrupt the regular and essential operation of the institution. At the same time, it should be made clear to the academic and the larger community that in their public expressions or demonstrations, students or student

organizations speak only for themselves.

(2) Students should be allowed to invite and hear any person of their own choosing. Those routine procedures required by an institution before a guest speaker is invited to appear on campus should be designed only to ensure that there is orderly scheduling of facilities, adequate financial underwriting for costs of services to be provided by the University, adequate preparation for the event, and that the occasion is conducted in a manner appropriate to an academic community. The University's control of campus facilities should not be used as a device of censorship. It should be made clear to the academic and larger community that sponsorship of guest speakers does not necessarily imply approval or endorsement of the views expressed either by the sponsoring group or the institution.

§ I-107  Religious Beliefs, Observances, and Practices

(a) Illinois law requires the University to reasonably accommodate its students' religious beliefs, observances, and practices in regard to admissions, class attendance, and the scheduling of examinations and work requirements. (See § I-501, Article 3, Part 2.)

(b) Any student may appeal in writing an instructor's decision on a request based on religious beliefs, observances, and practices to the dean of the academic unit offering the course. Before taking action, the dean or director should request that the instructor explain his or her decision in writing.

§ I-108  Nondiscrimination Policy

(a) The commitment of the University to the most fundamental principles of academic freedom, equality of opportunity, and human dignity requires that decisions involving students and employees be based on individual merit and be free from invidious discrimination in all its forms.

(b) It is the policy of the University not to engage in discrimination or harassment against any person because of race, color, religion, sex, pregnancy, disability, national origin, citizenship status, ancestry, age, order of protection status, genetic information, marital status, sexual orientation including gender identity, arrest record status, unfavorable discharge from the military, or status as a protected veteran and to comply with all federal and state nondiscrimination, equal opportunity, and affirmative action laws, orders, and regulations. This nondiscrimination policy applies to admissions, employment, and access to and treatment in University programs and activities. Complaints of invidious discrimination prohibited by University policy are to be resolved within existing University procedures.

(c) For additional information on the equal opportunity, affirmative action, and harassment policies of the University, please contact the Director of The Office of Diversity, Equity, and Access (ODEA) at:

1004 South Fourth Street
Champaign, IL 61820
(217) 333-0885
diversity@illinois.edu
diversity.illinois.edu

(d) For additional information on Title IX, ADA, or 504, please contact the Title IX Coordinator at the Title IX and Disability Office at:

703 South Wright Street, Third Floor
Champaign, IL 61820
(844) 616-7978
titleixcoordinator@illinois.edu
wecare.illinois.edu/titleix

§ I-109  Statement on Consenting Sexual Relationships

University guidelines on responsible professional conduct state that individuals assessing the work of others should base their assessments on appropriate professional criteria. Due to the inherent conflicts of interest, no individual should initiate or participate in institutional or educational decisions involving a direct benefit or penalty to a person with whom that individual has or has had a sexual relationship. Where supervisory or student teacher relationships exist between husband and wife, or members of a couple, whether married or not, it is the responsibility of the teacher or supervisor to alert his/her supervisor so that appropriate arrangements can be made.

§ I-110  Policy for the Provision of Reasonable Accommodations for Students with Disabilities

(a) The University provides reasonable accommodations to students with disabilities admitted to study at the University in accordance with the following procedures. As the term is used herein, "reasonable accommodations" refer to those academic adjustments, services, and aids provided to otherwise qualified students with disabilities to facilitate equal access to University programs and activities. The Division of Disability Resources and Educational Services (DRES) or the Center for Wounded Veterans in Higher Education (CWVHE), as applicable, coordinates the University's efforts to provide these reasonable accommodations. DRES and CWVHE will consult as necessary to facilitate the processing of requests for reasonable accommodations.

(b) In general, students are responsible for informing the University of their status as a person with a disability and their need for reasonable accommodations. Students with disabilities who are not veterans should direct their requests for reasonable accommodations to the DRES Student Services Office by phone at (217) 333-4603, or disability@illinois.edu. Students with disabilities who are veterans of the U.S. armed forces should direct their requests for reasonable accommodations to the CWVHE at (217) 300-3515 or cwvhe@ahs.illinois.edu. The applicable unit will determine what is a reasonable accommodation based upon an individual student's needs. For academic accommodations, DRES or CWVHE, as applicable, will consult with the faculty member for whose course the accommodations are sought. The University may decline requests for accommodations that impose an undue hardship on the campus or that require the fundamental alteration of academic standards, programs, or coursework.

(c) In order to be considered for reasonable accommodations, the student must meet the following requirements:

(1) The student must submit a completed Application for Services to DRES or CWVHE, as applicable. Students may obtain applications from:
DRES: in person at the Rehabilitation-Education Center at 1207 South Oak Street, Champaign IL, or online at disability.illinois.edu.
CWVHE: in person at 908 West Nevada Street, Urbana, IL, or online at woundedvetcenter.ahs.illinois.edu/.

(2) The student must have a disability and provide documentation of a disability in accordance with the applicable documentation criteria.

(d) To facilitate timely review of a student's request for reasonable accommodation, the student or prospective student who is requesting accommodations to access University programs and activities must submit a completed Application for Services to DRES or CWVHE, as applicable, as soon as possible. Some accommodations, such as interpreter, real-time captioning services, or the conversion of print-based educational materials to alternative accessible formats can require substantial lead time to schedule or prepare. Therefore, it is recommended that the student return the DRES or CWVHE Application for Services and discuss accommodation needs with DRES or CWVHE personnel at least six weeks before the date on which the student may first require the accommodations.

(e) A student may appeal to the Director of DRES or CWVHE, as applicable:

(1) an accommodation recommendation by DRES or CWVHE if the student deems such recommendation to be unsatisfactory;

(2) implementation of a DRES or CWVHE accommodation recommendation if the student deems such implementation ineffective. A student may appeal a determination of the

DRES Director or the CWVHE Director to the Dean of the College of Applied Health Sciences.

(f) A student may also direct questions or concerns regarding accommodation decisions by DRES or CWHVE or other campus units to the Office of Diversity, Equity, and Access (ODEA), which is located at 1004 South Fourth Street, Champaign, IL or by phone at (217) 333-0885.

## § I-111 Sexual Misconduct Policy

(a) The University of Illinois at Urbana-Champaign ("University") is committed to providing a safe and welcoming campus environment free from discrimination based on sex, which includes sexual assault, sexual exploitation, stalking, sexual harassment, dating violence, and domestic violence (collectively referred to as sexual misconduct). The University prohibits and will not tolerate sexual misconduct because such behavior violates the University's institutional values, adversely impacts the University's community interest, and interferes with the University's mission. The University also prohibits retaliation against any person who, in good faith, reports or discloses a violation of this policy, files a complaint, and/or otherwise participates in an investigation, proceeding, complaint, or hearing under this policy. Once the University becomes aware of an incident of sexual misconduct, the University will promptly and effectively respond in a manner designed to eliminate the misconduct, prevent its recurrence, and address its effects.

(b) This policy applies to (1) all students, Registered Organizations, Registered Student Organizations, and others subject to the student discipline pursuant to § I-301 or the Student Code; (2) all University employees, including student employees; (3) other affiliated individuals, including but not limited to, for purposes of this policy, visiting faculty, visiting scholars, and post-doctoral fellows; and (4) third parties, including but not limited to contractors, subcontractors, volunteers, and visitors. Any person asserting a violation may invoke this policy. This policy applies regardless of actual or perceived sexual orientation or gender identity. This policy covers conduct that occurs on University premises or property, as well as conduct that does not occur on University premises or property that substantially affects the University community's interest.

(c) Definitions:

(1) Sexual misconduct includes sexual harassment, sexual assault, sexual exploitation, stalking, dating violence and domestic violence.

(2) Sexual assault is any sexual act that does not involve the knowing consent of each person, including (A) any form of sexual penetration without consent; and (B) any intentional or knowing touching or fondling by either person, directly or through clothing, of the sex organs, buttocks, or breasts of the other person for the purpose of sexual gratification or arousal of either person without consent.

(3) Consent is informed, freely and actively given, mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity. A person can withdraw consent at any time. There is no consent when there is force, threats, intimidation, or duress. A person's lack of verbal or physical resistance or manner of dress does not constitute consent. Consent to past sexual activity with another person does not constitute consent to future sexual activity with that person. Consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another person. A person cannot consent to sexual activity if such person is unable to understand the nature, fact, or extent of the activity or give knowing consent due to circumstances including without limitation the following: (A) the person is incapacitated due to the use or influence of alcohol or drugs; (B) the person is asleep or unconscious; (C) the person is under the legal age to provide consent; or (D) the person has a disability that prevents such person from having the ability or capacity to give consent.

(4) Sexual exploitation is the use of another person's nudity or sexual activity without consent for the purpose of sexual gratification, financial gain, personal benefit, personal advantage, or any other non-legitimate purpose. Sexual exploitation includes, but is not limited to: (A) without the knowledge and consent of all participants, observing, recording, or photographing nudity or sexual activity of one or more persons in a

---

location where there is a reasonable expectation of privacy, allowing another to observe, record, or photograph nudity or sexual activity of one or more persons, or otherwise distributing recordings, photographs, or other images of the nudity or sexual activity of one or more persons; and (B) sending sexually explicit materials of another person without consent of the recipient.

(5) Sexual harassment is unwelcome sex-based, sex-based, or gender-based conduct, whether verbal, written, electronic, and/or physical in nature:

    (A) That is (1) sufficiently severe or pervasive; and (2) objectively offensive; and (3) unreasonably interferes with, denies, or limits a person's ability to participate or benefit from educational and/or employment opportunities, assessments, or status at the University; or

    (B) by a person having power or authority over another in which submission to such conduct is made explicitly or implicitly a term or condition of educational and/or employment opportunities, participation, assessments, or status at the University.

(6) Stalking is two or more acts directed at a specific person that would cause a reasonable person to fear for her, his, or others' safety, or to suffer substantial emotional distress, and includes, but is not limited to, following, monitoring, surveilling, or threatening a person; initiating or continuing contact with a person without consent; or interfering with or damaging a person's property.

(7) Dating violence is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim, and the existence of such a relationship shall be determined based on the reporting party's statement and with consideration of the length of relationship, the type of the relationship, and the frequency of the interaction between the persons involved in the relationship.

(8) Domestic violence is felony or misdemeanor crimes of violence committed by: (A) a current or former spouse or intimate partner of the alleged victim; (B) a person with whom the alleged victim shares a child in common; (C) a person who is cohabitating with, or has cohabitated with, the alleged victim as a spouse or intimate partner; (D) a person similarly situated to a spouse of the alleged victim under the domestic or family violence laws of the State of Illinois; or (E) any other person against an adult or youth alleged victim who is protected from that person's acts under the domestic or family violence laws of the State of Illinois.

(d) Retaliation is any action, or attempted action, directly or indirectly, against any person(s), who, in good faith, reports or discloses a violation of this policy, files a complaint, and/or otherwise participates in an investigation, proceeding, complaint, or hearing under this policy. Retaliation includes, but is not limited to harassment, discrimination, threats, job termination, adjustment in pay or responsibilities, or negative impact on academic progress. Actions are considered retaliatory if they have a materially adverse effect on the working, academic, or living environment of a person; or if they hinder or prevent the person from effectively carrying out their University responsibilities. Any person or group within the scope of this policy who engages in retaliation is subject to a separate complaint of retaliation under this policy.

(e) The Lead Title IX Coordinator is responsible for coordinating the University's efforts to comply with and carry out its responsibilities under Title IX of the Education Amendments of 1972 ("Title IX"), which prohibits sex discrimination, including sexual misconduct, in education programs and activities for institutions that receive federal financial assistance, as well as retaliation for the purpose of interfering with any right or privilege protected by Title IX. The Lead Title IX Coordinator oversees the University's response to all reports and complaints of sexual misconduct to monitor outcomes, identify and address any patterns or systemic problems, and to assess their effects on the campus climate. The Lead Title IX Coordinator also evaluates requests for confidentiality by those who report or complain about sexual misconduct in the context of the University's responsibility to provide safe and welcoming campus environment for all students free from discrimination based on sex. Following up on a report or complaint of sexual misconduct, the University is required to conduct an adequate, reliable, impartial, equitable, and prompt investigation, including: (1) determining whether the report or complaint alleges conduct that may, upon further investigation, constitute prohibited sexual misconduct; (2) appointing an investigative team to conduct that investigation; (3) determining whether reports and complaints are

handled properly in a prompt and timely manner; (4) informing all parties regarding the disciplinary process; (5) confirming that all parties have been notified of a decision and the right to, and procedures for, an appeal, if applicable; (6) maintaining information and documentation related to the investigation in a secure manner, consistent with the University's obligations to disclose information as required by law; and (7) monitoring compliance with timeframes set forth in the applicable procedures.

(f) Danielle Morrison serves as the University's Title IX and Disability Coordinator and can be contacted at the Title IX and Disability Office, 703 South Wright Street, Third Floor, Champaign, IL 61820; by phone at (844) 616-7978; or by email at **titleixcoordinator@illinois.edu**.

(g) A person should contact the Lead Title IX Coordinator or a Deputy Title IX Coordinator to: (1) seek information or training about rights and available actions to resolve reports or complaints involving potential sex discrimination, including sexual misconduct; (2) file a complaint or make a report of sex discrimination, including sexual misconduct; (3) notify the University of an incident, policy or procedure that may raise potential Title IX concerns; (4) get information about available resources (including confidential resources) and support services relating to sex discrimination, including sexual misconduct; and (5) ask questions about the University's policies and procedures related to sex discrimination, including sexual misconduct.

## PART 2. GENERAL RESPONSIBILITIES OF STUDENTS

### § I-201  Responsibilities of Students

(a) Students are responsible for knowing and complying with the regulations of the University, their college, and the departments from which they take courses, and for fulfilling the requirements for a particular degree. Regulations applicable to given colleges may be obtained from the respective deans.

(b) It is expected that students enrolled in the University will conduct themselves at all times in accordance with accepted principles of responsible citizenship and with due regard for the rights of others.

## PART 3. STUDENT DISCIPLINE

### § I-301  Basis for Discipline—Source and Jurisdiction

(a) By authority of the Board of Trustees, the Urbana-Champaign Senate Committee on Student Discipline is responsible for the administration of student discipline for acts involving the violation of campus or University regulations. These regulations are formulated by a variety of sources, including, but not limited to, the Conference on Conduct Governance, the Senate, the Chancellor, the President, and the Board of Trustees.

(b) It is in the best interest of the University and all those who are students or who may desire to become students at the Urbana-Champaign campus that the basis for discipline at this campus be clearly defined. The University discipline system recognizes that not all violations of law affect the interests of the University community, and the discipline system accepts jurisdiction only in those instances in which the University community's interest is substantially affected. On the other hand, the University may take disciplinary action for incidents that violate the University's rules of conduct even though such conduct is not proscribed in the courts. All members of the University community are expected to respect high standards of integrity and ethical behavior. The University discipline system may take action only upon the following basis:
(1) all actions that are violations of law or Board of Trustees' action or any University rule of conduct and that occur on University premises or property
(2) all actions that violate any of the laws or regulations cited in section (a) above and that substantially affect the University community's interest, even though such actions

---

do not occur on University premises or property (for further information about the criteria used by the Senate Committee on Student Discipline in determining the kinds of conduct covered by this jurisdiction, see www.conflictresolution.illinois.edu or contact the Office for Student Conflict Resolution)
(3) all cases referred to the discipline system following interim suspension by the Chancellor
(4) academic violations
(5) appeals and referrals from student judiciaries arising from violations of regulations
(6) violations of University vehicle or bicycle regulations

(c) Individuals subject to student discipline include but is not limited to all persons:
(1) taking courses at the University;
(2) who cancel, withdraw, or graduate after committing behavior which may violate the code;
(3) who are not officially enrolled for a particular term but have a continuing relationship with the University;
(4) who have been notified of and accepted their admission.
This definition includes but is not limited to individuals between academic terms and persons who consent to participating in the student discipline process.

(d) The actions of a Registered Organization and Registered Student Organization in University-sponsored activities or University-sponsored activities that are in violation of University regulations for organizations may result in disciplinary action against that organization. In addition, individuals involved may also receive disciplinary action as well.

(e) The University reserves the right to deny admission to any person because of previous misconduct that may substantially affect the interest of the University, or to admit such a person on an appropriate disciplinary status. The admission of such a person will not be approved or denied until the case has been heard by the appropriate disciplinary committee. (This applies to a person not now enrolled in the University who might apply for admission, or to a person who has pre-enrolled whether or not the applicant has paid a deposit.) A favorable action of the appropriate disciplinary committee does not abrogate the right of any dean or director to deny admission on the basis of scholarship. (See § 1-303.)

(f) The University reserves the right to withhold authority to register to any student or former student because of previous misconduct that may substantially affect the interests of the University or to assign appropriate disciplinary status to the student or former student. Permission to register will not be approved or denied until the case has been heard by the appropriate disciplinary committee. A favorable action by the appropriate disciplinary committee does not abrogate the right of any dean or director to deny the authority to register on the basis of scholarship. (See § 1-303.)

(g) Students admitted to or enrolled in the Graduate College or any of the professional schools or colleges are subject to any additional conduct regulations of those units. Regulations will be available in printed form to those students.

(h) The University will take disciplinary action for conduct violating §§ 1-302 to 1-311 below. Disciplinary action also may be taken for violations of other sections. Examples include but are not limited to: (1) § 1-102(d) (Orderly Conduct of Classes); (2) § 2-402 (Library Regulations); (3) § 2-404 (Picketing); (4) § 2-405 (Solicitation and Commercial Activity in University Residence Halls); (5) § 2-406 (Posting and Distribution of Handout Materials); and (6) § 2-606 (Use of In-line Skates, Roller Skates, and Skateboards).

(i) Alleged violations of the *Student Code* noted in (h) above are resolved through procedures developed and approved by the Senate Committee on Student Discipline. Its Subcommittees on Student Conduct, and Disciplinary Officers approved by the Senate Committee on Student Conduct, hear cases involving violations of the disciplinary Officer Procedures (informal resolution); Procedures for Appeal from the Action of Disciplinary Officers; Procedures for the Subcommittee on Undergraduate Student Conduct; and Procedures for Appeal to the Senate Committee on Student Discipline. These procedures may be found at www.conflictresolution.illinois.edu or by contacting the Office for Student Conflict Resolution. Other procedures available at the Office for Student Conflict Resolution include

procedures for the subcommittees for graduate students, law students, and veterinary medicine students. Among other rights delineated in these procedures, the right to written notice of charges and an opportunity to respond to those charges are guaranteed.

§ I-302  Rules of Conduct

Students enrolling in the University assume an obligation to conduct themselves in a manner compatible with the University's function as an educational institution and suitable to members of the academic community. Conduct for which students are subject to discipline includes, but is not limited to, the following.

(a) Conduct that threatens the health or safety of any person, including but not limited to:
(1) causing bodily harm to an individual
(2) making physical contact of an insulting or provoking nature with an individual
(3) reckless disregard for the health or safety of any person
(4) any threat or physically threatening behavior which creates a reasonable fear for a person's safety
(5) engaging in behavior which is so persistant, pervasive, or severe as to deny a person's ability to participate in the University community

(b) Conduct that violates the University's sexual misconduct policy, including;
(1) sexual assault, as defined in § I-111(c)(2)
(2) sexual harassment, as defined in § I-111(c)(5)
(3) sexual exploitation, as defined in § I-111(c)(4)
(4) dating violence, as defined in § I-111(c)(7)
(5) domestic violence, as defined in § I-111(c)(8)
(6) retaliation, as defined in § I-111(d)

(c) Stalking; two or more acts directed at a specific individual that would cause a reasonable person to fear for his, or others' safety, or to suffer substantial emotional distress. Relevant acts include, but are not limited to, following, monitoring, surveilling, or threatening; a person; initiating or continuing contact with a person without consent; or interfering with or damaging a person's property. (See also § I-111(c)(6) of the Student Code.)

(d) Hazing: any action taken or situation created (1) for the purpose of initiation into, admission into, affiliation with, or as a condition of continued membership in, a group or organization; and (2) to produce physical discomfort or injury, mental discomfort, embarrassment, or ridicule. Such actions or situations may include but are not limited to the following; use of alcohol; personal servitude; paddling in any form; creation of excessive fatigue; physical and psychological shocks; wearing of apparel which is conspicuous or not in good taste; engaging in public stunts; degrading or humiliating games and activities; or any activities which are not consistent with the academic mission, organizational ritual or policy, or applicable state or local law. Hazing may occur regardless of a person's willingness or consent to participate in the activity.

(e) The use of force or violence, actual or threatened, to willfully deny, impede, obstruct, impair, or interfere with any of the following:
(1) the freedom of movement of any person, including entering or leaving property or facilities
(2) the performance of institutional duties by a member of the University or
(3) by knowingly occupying or remaining in or at any property or facility owned or controlled by the University after receiving due notice to depart.

(f) Any conduct that substantially threatens or interferes with the maintenance of appropriate order and discipline in the operation of the University. Without excluding other situations, examples include shouting, noise making, obstruction, and other disruptive actions designed or intended to interfere with or prevent meetings, assemblies, classes, or other scheduled or routine University operations or activities.

(g) Providing false or misleading information to a member or agent of the University acting, in the performance of his or her duty; or failing to comply with reasonable directions of a

member or agent of the University acting in the performance of his or her duty.

(h) Providing false or misleading information to a University or other law enforcement official acting in the performance of her or his duty; or failing to comply with the reasonable directions of a University or other law enforcement official acting in the performance of her or his duty.

(i) Participation in a disruptive or coercive demonstration. A demonstration is disruptive or coercive if it substantially impedes University operations, substantially interferes with the rights of others, or takes place on premises or at times where students are not authorized to be. There is no requirement that University authorities order students to cease participation in a disruptive or coercive demonstration.

(j) Theft, unauthorized use, or unauthorized possession of property or services of another; or knowing possession of stolen property.

(k) Intentional or reckless destruction or damage of University, public, or personal property of another.

(l) Indecent exposure of the body, including, but not limited to urination or defecation in public.

(m) Unauthorized entry to or use of University, public, or private premises.

(n) Abuse of computers where the University community's interest is substantially affected, including, but not limited to:
(1) unauthorized entry into a file for any purpose
(2) unauthorized transfer of a file
(3) unauthorized use of another individual's identification, account, or password
(4) knowingly disrupting the work of another person or the normal operation of the University computing system
(5) accessing child pornography
(6) the use of computing facilities and resources in violation of copyright laws.

(o) Abuse of the University disciplinary system including, but not limited to:
(1) failure to obey the directive of a disciplinary body or University officials in performance of their duties
(2) knowing falsification, distortion, or misrepresentation of information before a disciplinary body
(3) deliberate disruption or interference with the orderly conduct of a disciplinary proceeding
(4) knowingly initiating a disciplinary proceeding without cause
(5) attempting to influence the impartiality of a member of a disciplinary body prior to, or during the course of, the disciplinary proceeding
(6) harassment or intimidation of any participant in the disciplinary system
(7) failure to comply with the sanction(s) imposed under the Student Code

(p) Making, attempting to make, or distributing a sound or visual recording of any person(s) in bathrooms, showers, bedrooms, locker rooms, or any other premises where there is a reasonable expectation of privacy, without the knowledge and consent of all participants subject to such recordings.

(q) Violation of published University policies, rules, or regulations.

(r) Inciting, aiding, or encouraging others to engage in a behavior which violates the Student Code.

(s) Committing or attempting to commit any act which would be a violation of local, state, or federal law on or off University property, when such behavior is detrimental to the University community's interest.

(t) Sale or Distribution of Lecture Notes or Course Materials. No student shall sell, deliver or distribute copyrighted lecture notes or other course materials without the express permission of the copyright holder. An example of an infraction would include posting on a website or selling instructor copyrighted slides, lecture notes or other expressions fixed in a medium. (See also the University General Rules, Art. III, §4 regarding copyright policy.)

§ I-303 Falsification of Documents

(a) Any student who, for purposes of fraud or misrepresentation, falsifies, forges, defaces, alters, or mutilates in any manner any document or representation thereof may be subject to discipline when this action substantially affects the University community's interest. Some examples of documents covered by this regulation include identification cards, program requests, change slips, receipts, transcripts of credits, library documents, petitions for reclassification of residency status, etc.

(b) Any applicant who withholds information pertinent to the admissions decision or gives false information while making application for admission to the University will be declared ineligible for admission. In cases discovered after admission has occurred but prior to initial registration, the admission led to admission that would not have been granted based on the person's academic record, the student enrolled will have his or her registration canceled. The appropriate action will be invoked by the Director of Undergraduate Admissions, Director of Graduate and Professional Admissions and the Registrar and the dean of the college involved. Cases in which admission or registration cancellation is contested in writing by the applicant or student within ten working days after notification will be reviewed by the Office of the Provost or a designee.

If, however, the person would have been admissible based on his or her true record, the registered student will be referred for possible disciplinary action, including, dismissal, to the Senate Committee on Student Discipline.

(c) Upon admission and prior to degree conferral, students are responsible to disclose and provide complete, official transcripts from any post-secondary work completed outside the University of Illinois system, including all international and domestic coursework for the purpose of consideration of transfer articulation. It is recommended that students receive appropriate advising from their college prior to undertaking outside coursework to be sure it will transfer for specific curricular needs. Failure to disclose information may result in the rescission of an offer of admission, cancellation of registration or disciplinary action at the discretion of the Dean of Students, college, and / or Director of Graduate and Professional Admissions and Recruiting.

(d) Any student who knowingly withholds information or gives false information in any document or materials submitted to any member or agent of the University may be subject to discipline.

§ I-304 Identification Cards

(a) Each new student is issued a photo identification card, which must be retained by the student while he or she is registered at the University. The ID card remains the property of the University and should be returned to the Campus ID Center upon leaving the University.

(b) Any person who alters or intentionally mutilates a University ID card (including but not limited to punching holes in the card, applying stickers, etc.), or who uses the ID card of another or allows his or her ID card to be used by another, may be subject to discipline. (See § I-303.)

(c) The University ID card must be presented for identification purposes at the request of an agent of the University when the agent is acting in the performance of his or her supervisory or security function (for example, examination proctor, University police officer, residence hall director or adviser, recreational facility supervisor, ticket takers, ushers). Any student refusing to provide the University ID card when requested by an agent of the University

may be subject to discipline.

(d) An ID card may be confiscated by an agent of the University when acting in the performance of his or her duties if:
(1) the ID card is in the possession of an individual other than the one to whom the ID was issued and that individual attempts to use the card to represent himself or herself as a duly registered student, or
(2) the ID card is presented by the individual to whom it was issued but is not valid for the term of registration at the time and the individual attempts to represent himself or herself as a duly registered student.

(e) If a card is lost or stolen, a student should immediately notify the Campus ID Center to deactivate the online functionality of the ID card (e.g., meal plan, door access, etc.). Until the ID Center is notified, the student may be held responsible for unauthorized use of the ID card. If a confiscated, surrendered, lost, stolen, or otherwise damaged card has a balance on the value stripe, there is no guaranteed refund on the unused balance on the card.

(f) A charge is made for replacing each lost, mutilated, confiscated, or stolen student ID card.

(g) Card data, including but not limited to the UIN, card number, and photo, may be used for University purposes in accordance with Article 3, Part 6 of the Student Code.

(h) An ID card is non-transferable and does not authorize the card holder to obligate the University of Illinois in any way.

(i) A student who links an i-card to an authorized, contracted University service provider (e.g., for banking services) understands and agrees that he or she is releasing the UIN (as part of the card number) to said service provider. A student is responsible for notifying all said service providers if a linked card is lost or stolen.

(j) By accepting possession of the i-card, cardholder agrees to hold harmless the Board of Trustees of the University of Illinois, and its officers, employees, representatives, or agents, from and against any claims, damages, costs, expenses, including an amount equal to reasonable attorney's fees, or liabilities, including for loss or damage to any property or for death or injury to any person or persons, arising out of or in any way connected with any incorrect or outdated phone numbers that may be listed on the i-card.

§ I-305   Policy on Drugs

(a) The University seeks to inform all students about drugs and their effects. To this end, it is the policy on this campus to provide educational programs and counseling to drug users and those affected by the drug use of others, to discourage illicit drug use, to eliminate dealing in or providing of illegal drugs, and to uphold the law in these matters. Various local agencies on campus can provide help. These include the Counseling Center, Student Services Building, 610 East John Street, Champaign, IL 61820, (217) 333-3704, and the Health Education Department, Drug and Alcohol Educator, McKinley Health Center, 1109 South Lincoln Avenue, Urbana IL 61801, (217) 333-2816.

(b) Violations of the University's policy on drugs by a University student raises the question of a student's fitness to continue at the University of Illinois.

(c) Drugs include controlled substances, alcohol, and substances that may be detrimental to health, even though not subject to state and federal laws.

(d) The illegal possession or use of drugs or drug paraphernalia is prohibited. While the use of medical marijuana has been legalized in the state of Illinois, the possession or use of prescribed medical marijuana is prohibited on campus property.

(e) The illegal distribution, sale, making or manufacture of drugs is prohibited.

(f) Drug use resulting in incapacitation that requires transportation to the hospital by emergency medical personnel, or refusal to accept such transportation when it is

recommended by emergency medical personnel, can trigger a mandatory assessment (see §2-102).

## § I-306 Alcoholic Beverages—Preamble

(a) The University of Illinois at Urbana-Champaign expects all students to exhibit behavior compatible with membership in a community of scholars. Students shall conduct themselves in a civil and mature manner, respecting the rights and property of others. (See also § I-201.) Having consumed alcohol is not an excuse for failure to meet these expectations.

(b) Because of the University's concern for the health and rights of individuals and because the excessive consumption of alcohol frequently results in the user becoming, either a violator or a victim, the University will respond when inappropriate alcohol-related behavior is demonstrated. These interventions will include a team approach involving, when appropriate, any or all of the following: the Division of Public Safety, the Office of Public Affairs, and Student Affairs units including the Dean of Students Office, the Office for Student Conflict Resolution (Student Judicial Affairs), Residential Life, the Alcohol and Other Drug Office, the Counseling Center, and McKinley Health Center.

(c) The following regulations apply to all University of Illinois at Urbana-Champaign students and Registered Organizations and Registered Student Organizations while on campus, while engaged in University-related activities, while within the environs of Champaign County, or in other circumstances where a substantial University community interest exists. A "substantial University community interest" exists, but is not limited to, situations in which individual or group alcohol consumption results in actual or threatened injury to persons, damage to property, or disruption of a University-related event.

## § I-307 Alcoholic Beverages—General Rules

(a) All students, wherever they happen to be, are expected to observe the liquor laws of the local jurisdiction. (See § I-201 below.) Under the liquor laws of the State of Illinois and the cities of Champaign and Urbana, and this rule:
(1) Possession or consumption of alcoholic beverages by students under twenty-one years of age is prohibited.
(2) No student may give or otherwise furnish alcoholic beverages to any person under twenty-one years of age. Additionally, no student may authorize or permit a residence which he or she occupies to be used for possession or consumption of alcohol by any person under twenty-one years of age.

(b) In determining appropriate sanctions for violations of subsection (a) above, communal alcohol (for example, in kegs or not in its original container, or the distribution of cups with open access to alcohol), drinking games (or other activities that promote unsafe or inappropriate drinking), and open parties may be considered aggravating factors.

(c) The fact that a student may have been drinking shall not be accepted as an excuse for disruptive behavior. In such instances, appropriate sanctions will be applied and referral for personal assistance may be indicated. (See §2-102 and §-603 concerning Mandatory Assessment and Parental Involvement, respectively.)

(d) The transfer or alteration of identification cards, the use or sale of the identification card of another or a false or forged identification card, or the use of false information to obtain an identification card is prohibited. Additionally, presentation or possession of false identification in an attempt to enter a liquor establishment or to procure alcohol is prohibited.

(e) Alcohol use resulting in incapacitation that requires transportation to the hospital by emergency medical personnel, or refusal to accept such transportation when it is recommended by emergency medical personnel, can trigger a mandatory assessment. (See §2-102.)

(f) No minor (eighteen years of age or younger in Champaign; seventeen years of age or

younger in Urbana) is allowed to be present in a liquor establishment unless otherwise permitted by local ordinances. Additionally, holding or carrying open containers of alcoholic beverages out of a liquor establishment or in public areas, in violation of federal, state, and/or local law, is prohibited.

(g) Driving under the influence of alcohol or other drugs poses a substantial risk to the safety of the campus community and is prohibited. Substantial penalties exist in Illinois for the operation of a motor vehicle by a driver with a blood alcohol concentration (BAC) of .08 or greater. Arrests are also possible at lower levels if driving is impaired. Drivers under twenty-one years of age with any trace of alcohol in their systems can lose their driving privileges. Transporting open alcohol containers in a motor vehicle or allowing an intoxicated person to operate a vehicle are also punishable under Illinois law.

## § I-308 Alcoholic Beverages—Special Rules Relating to University Property

(a) Persons twenty-one years of age or older may possess or consume alcoholic beverages on the following property under control of the University:
(1) Property at which the University furnishes the alcohol and holds a State of Illinois liquor license or local catering license. These include, for example, Willard Airport, the Levis Faculty Center, Krannert Center for the Performing Arts, Illini Union, Spurlock Museum, Beckman Institute, and Allerton House.
(2) Property used for specifically designated functions approved by the appropriate Vice Chancellor, dean or director of the academic or administrative unit sponsoring the event, or by the Chancellor. In cases governed by this subsection, furnished alcohol may be sold only if the provider holds a valid caterer's license.
Other than as outlined above, no person may possess or consume alcoholic beverages on any property under the control of the University.

(b) Possession and consumption of alcoholic beverages in University certified student housing is governed as follows:
(1) University Residence Halls. Persons twenty-one years of age or older may only possess and consume alcoholic beverages in their rooms or the room of another person twenty-one years of age or older, with the door closed. No alcoholic beverages are permitted in public areas. (Also see the "Hallmarks" handbook - http://www.housing.illinois.edu/hallmarks)
(2) University Family or Graduate Housing: Persons twenty-one years of age or older may possess and consume alcoholic beverages in their room/apartment or the room/apartment of another twenty-one years of age or older. Requests to allow consumption of alcoholic beverages for events/activities in public areas are to be directed to University Housing administration. Any approved functions must be in accordance with all applicable laws and ordinances.
(3) Other Certified Housing: Persons living in privately owned and/or operated certified housing, including fraternities and sororities, must abide by the decision of the owner-operator in accordance with all applicable laws and ordinances with regard to the consumption of alcoholic beverages; total prohibition may be required. In certified housing units where the possession and consumption of alcoholic beverages is allowed by those twenty-one years of age or older, all applicable laws and ordinances must be followed. The Board of Fraternity Affairs and the Board of Sorority Affairs also promulgate rules and regulations that apply to fraternity and sorority certified housing units.

## § I-309 Possession or Storage of Weapons

(a) Except as provided in subsection (c), possession or storage of weapons by students is prohibited on any property owned or controlled by the University, including University certified housing units.

(b) Prohibited weapons include but are not limited to any: (1) firearm, firearm ammunition, BB gun, pellet gun, paintball gun (except as part of Registered Organization or Registered Student Organization activity), tear gas gun, stun gun, taser, or other dangerous or deadly device of similar type; (2) knife (with a blade of at least 3 inches in length (except an ordinary eating utensil), dagger, dirk, switchblade knife, stiletto, ax, hatchet, or other

deadly or dangerous weapon or instrument of similar type; (3) bludgeon, blackjack, slingshot, sandbag, sand club, metal knuckles, billy club, throwing star, nunchaku, or other dangerous or deadly weapon of similar type; (4) bomb, bombshell, grenade, firework, bottle or other container containing an explosive, toxic, or noxious substance, unless under academic/classroom supervision, (other than an object containing a nonlethal noxious liquid, gas, or substance designed solely for personal defense possessed by a person 18 years of age or older); and (5) souvenir weapon or other weapon that has been rendered permanently inoperative.

(c) With appropriate approval possession of a weapon on nonresidential University property may be permitted when it is used as a prop or accessory in situations such as (1) a University class; (2) a University-sponsored or sanctioned artistic performance; or (3) a activity of a Registered Organization or Registered Student Organization. Such weapons may not, however, be stored on University property, except in a facility approved for that purpose by the University.

(d) Subsections (a) to (c) above apply to possession or storage, not use of a weapon. Use of a weapon that results in harm or threat of harm to any person or property is governed by § 1-302, and subsection (e) below.

(e) In determining appropriate sanctions for violations of the student discipline rules contained in this Code (Article 1, Part 3), the use or threatened use of any object (whether or not defined as a weapon in this section) while committing the violation may be considered an aggravating factor.

§ 1-310 Unauthorized Use, Abuse, or Interference with Fire Protection Equipment, Building Security Systems, Security or Fire Personnel, or Warning Devices

(a) The unauthorized use, abuse, or interference with fire protection equipment, firefighting personnel, or warning devices may result in death, injury, or substantial property damage. It is critically important that all fire protection equipment be in its place and in proper working condition if the safety and welfare of the members of the University community are to be assured.

(b) It is a violation of Illinois criminal law to willfully or maliciously cut, injure, damage, tamper with, or destroy any fire hydrant, the hose, fire engine, or other public or private firefighting equipment or any apparatus pertaining to such equipment or firefighting, operated or used by any person or any fire hydrant without proper authorization. It is also a violation of Illinois criminal law to knowingly, without authorization, damage any property supported in whole or in part with state funds or federal funds administered or granted through a state agency. Other Illinois laws may also relate to the unauthorized use, abuse, or interference with fire protection equipment or warning devices.

(c) A violation of any federal, state, or local law concerning fire protection equipment or firefighting personnel may result in suspension or dismissal from the University.

(d) Tampering with locks, other door hardware, cameras or other equipment used to provide security on campus (including the unauthorized propping of doors) may result in suspension or dismissal from the University.

(e) Enabling unauthorized access to campus facilities by providing keys or access cards or by other means may result in suspension or dismissal from the University.

§ 1-311 Certain Consequences of Disciplinary Action

(a) Sanctions may be imposed for violations of the student discipline rules stated in this part (Article 1, Part 3.)

(b) The Senate Committee on Student Discipline has the right to withhold privileges of the academic community, including the conferral of the degree itself, at any point prior to the conferral of the degree. In instances in which dismissal is a possibility for disciplinary infractions, the conferral of the degree is withheld until the disciplinary action has been

resolved. (See §§ 3-313 and §§ 3-701 to §3-704.)

(c) Students dismissed or suspended from the University for disciplinary reasons may be excluded from University classes, activities, facilities, buildings, and/or premises by the appropriate disciplinary authority. The same exclusions may be applied by the Chancellor in exercising the power to suspend students. (See § 3-508 on refunds.)

(d) Cancellation or withdrawal from the University does not abrogate the authority of the institution to pursue disciplinary action (see subsection 3-313(a)(3)).

PART 4. ACADEMIC INTEGRITY POLICY AND PROCEDURE

§ 1-401 Policy Statement; Application; Definitions

(a) Policy Statement. The University has the responsibility for maintaining academic integrity so as to protect the quality of education and research on our campus and to protect those who depend upon our integrity.
(1) Expectations of Students. It is the responsibility of Students to refrain from infractions of academic integrity, from conduct that may lead to suspicion of such infractions, and from conduct that aids others in such infractions. Students have been given notice of this Part by virtue of its publication. Regardless of whether a student has actually read this Part, a student is charged with knowledge of it. Ignorance is not a defense.
(2) Expectations of Instructors. It is the responsibility of each Instructor to establish and maintain an environment that supports academic integrity. An essential part of each Instructor's responsibility is the enforcement of existing standards of academic integrity. If Instructors do not discourage and act upon violations of which they become aware, respect for those standards is undermined. Instructors should provide their students with a clear statement of their expectations concerning academic integrity.

(b) Application. This Part contains the procedures for addressing course-based academic integrity infractions, including proficiency tests taken after enrollment, for all courses in all colleges except for courses in the College of Law, the College of Medicine, and the College of Veterinary Medicine. This Part also does not apply to pre-enrollment infractions (see § 1-301 and § 1303) or infractions of the Academic Integrity in Research and Publications Policy.

(c) Definitions. For purposes of this Part, the following definitions shall apply:
(1) Business Day. Monday through Friday, excluding University and campus holidays and reduced service days.
(2) Consultant. A person with whom a student or Instructor may privately consult during the process. A Consultant may attend hearings with a student or Instructor, but may not participate in the hearings, and may not serve as a witness. Each participant may be accompanied by only one Consultant.
(3) Dean. The dean of the college or head of the equivalent academic unit in which a course or examination is conducted or his/her designee.
(4) Executive Officer (EO). The executive officer or head of the department or unit in which a course or examination is conducted or his/her designee.
(5) Instructor. A faculty member or authorized staff member who supervises any academic endeavor.
(6) Notice. A written communication conveying information to or from a participant in the process. E-mail notices are strongly encouraged.
(7) Record. The Instructor's Allegation Notice, written Student Response, any materials relied upon by the Instructor to make the Instructor's decision, the course syllabus, and the Instructor's Decision Notice.

§ 1-402 Academic Integrity Infractions

(a) Cheating. No student shall use or attempt to use in any academic exercise materials, information, study aids, or electronic data that the student knows or should know is

# Attachment B

# STUDENT DISCIPLINARY PROCEDURES

## TABLE OF CONTENTS

Article I. BACKGROUND ................................................................................................. 2

    Section 1.01: History ................................................................................................. 2

    Section 1.02: Philosophy .......................................................................................... 2

    Section 1.03: Scope ................................................................................................... 2

    Section 1.04: Nature of System ................................................................................ 3

Article II. DISCIPLINARY OFFICER AND HEARING COMMITTEE PROCEDURES ...................... 4

    Section 2.01: Definitions .......................................................................................... 4

    Section 2.02: Disciplinary Officer Procedures ......................................................... 4

    Section 2.03: Subcommittee Procedures ................................................................... 5

    Section 2.04: Actions Possible in Individual Student Discipline Cases ................................. 8

Article III. APPEALS ................................................................................................. 11

    Section 3.01: In General .......................................................................................... 11

    Section 3.02: Appeals to the Executive Director .................................................... 11

    Section 3.03: Appeals to Subcommittee and SCSD ............................................... 12

Article IV. MISCELLANEOUS ................................................................................ 14

    Section 4.01: Subcommittee Member Selection and Removal ................................ 14

    Section 4.02: Student Petitions ............................................................................... 15

    Section 4.03: Procedures in Cases of Interim Suspension by the Chancellor ................... 16

    Section 4.04: Garrity Procedures ............................................................................ 17

    Section 4.05: Access to Records and Record Retention.......................................... 17

    Section 4.06: No Contact Directives ....................................................................... 17

APPENDIX A ............................................................................................................ 19

APPENDIX B ............................................................................................................ 21

APPENDIX C ............................................................................................................ 23

APPENDIX D ............................................................................................................ 31

## Article II. DISCIPLINARY OFFICER AND HEARING COMMITTEE PROCEDURES

### Section 2.01: Definitions

(a) Advisor.  A person who accompanies a student to a disciplinary meeting and who is intended to protect the rights of the student.  Since the Senate Committee on Student Discipline wants to retain the student committee dialogue, the advisor may not participate in that dialogue.

(b) Alleged Victim.  A person who claims to have been or is perceived to have been a victim of a crime of violence or non-forcible sex offense.

(c) Business Day.  Any weekday when university offices are open for official business.

(d) Complainant.  The university who alleges a complaint against a student that violates the Student Code.

(e) Disciplinary Officer (DO).  A university employee responsible for investigating and/or adjudicating alleged violations of the Student Code.  May also be referred to as a "Hearing Officer".

(f) Educational Sanction.  An assignment, requirement, or task educationally related to the violation.

(g) Executive Director (or Director). The Director of the Office for Student Conflict Resolution or their designee.

(h) Executive Session.  Executive session includes the voting members of the committee and other non-voting parties at the discretion of the committee.

(i) Formal Sanction.  A disciplinary status imposed by the university in response to a violation.

(j) Notice. Notice is deemed given on the first business day after mailing, or immediately when hand delivered or sent to the respondent's e-mail address.

(k) Respondent. A person who is alleged to have violated the Student Code.

(l) Senate Committee.  The Senate Committee on Student Discipline (SCSD).

(m) Witness.  A person who may have relevant information regarding the facts of the case.

### Section 2.02: Disciplinary Officer Procedures

The Senate Committee on Student Discipline has designated as Disciplinary Officers (DOs) all professional staff in the Office for Student Conflict Resolution as well as specific professional staff in University Housing. In addition, the Executive Director is empowered to designate other trained university employees as DOs as needed. These DOs are responsible for investigating undergraduate and graduate student cases and for adjudicating undergraduate and graduate student cases that do not warrant referral to one of the Subcommittees on Student Conduct. For students in the College of Veterinary Medicine, the DO is the Dean of the college or their designee, though this responsibility may be delegated to the Office for Student Conflict Resolution. Procedures for the College of Law are located in Appendix C.

(a) **Intake and Review**.  All concerns about violations of the Student Code will be referred to a DO. The DO will review the allegations and select the appropriate charges to be considered, if any.

(b) **Charge Letter**.  The DO will issue a charge letter which shall inform the respondent of the approximate date, location, and type of incident, as well as of the section(s) of the Student Code

that have allegedly been violated.  The DO will encourage the respondent to schedule an appointment to discuss the matter.   The respondent may waive their right to a charge letter.

(c) **Administrative Appointment**.  At the appointment, the DO shall summarize the charge(s), explain the process, and engage in a discussion concerning the incident in question with the respondent.  A respondent may have an advisor present at any point during the DO procedures.

(d) **Administrative Disposition**.  With the exception of cases in which the allegations, if found true, would likely result in suspension or dismissal, the DO has the authority to make a finding of fact and decide whether it is more likely true than not true that the respondent's conduct constitutes a violation of the Student Code.

(e) **Contested Charges**. If the respondent does not admit to the charges, the respondent may provide a written response to the allegations within three business days, unless otherwise agreed. The response should include the respondent's reaction to the charges, outline any possible mitigating factors in the offense, and include the names and contact information of potential witnesses and the nature of the witness information.

(f) **Investigation**.  The DO will review all information submitted and may conduct additional investigation to determine if it is more likely true than not true that the respondent is responsible for violating the Student Code. The DO may forward a matter to a subcommittee before reaching a DO finding and sanctioning decision.

(g) **Decision**.  The DO is authorized to make a finding of fact, determine violations of the Student Code, and assign any disciplinary sanction, educational sanction, or restriction, with the exception of suspension or dismissal. The respondent must be notified of the outcome of the DO's decision and sanctions in writing.

(h) **Appeal**.  The respondent may appeal the DO decision according to the guidelines in this document.

(i) **Expedited Case Disposition**.  If a code violation that by itself or when combined with the respondent's disciplinary history would warrant suspension or dismissal is found, the DO may offer the respondent  an Expedited Case Disposition and waiver of appeal (ECD).  If the offer is accepted, the respondent and DO must sign the ECD, which must then be ratified by the appropriate subcommittee.  A respondent may request to void the ECD within three business days of their signature by notifying the Executive Director in writing.  If the respondent rejects or fails to respond to the ECD, a hearing will be scheduled before the appropriate subcommittee on student conduct.

(j) **Failure to Participate**.  If a respondent fails to participate in the process by failing to attend a meeting or providing information, the DO may render a decision based on available information.

## Section 2.03: Subcommittee Procedures

(a) **Jurisdiction**.  The subcommittees have jurisdiction over two categories of matters:  (1) cases in which the allegations, if found true, would likely result in suspension or dismissal; and (2) appeals from actions of record taken by Disciplinary Officers.

(b) **Process**

    (i) **Pre-hearing Information**.

        1.  The DO will provide written notice of the hearing.  The notice must include:

            a.  The approximate date, place, and nature of the alleged violations.

b.  The date, place, and time of the scheduled hearing.

c.  The code violations the subcommittee will address.

d.  The web location of the procedures for the hearing.

e.  A statement concerning the respondent's right to review the hearing file prior to the hearing.

f.  A statement concerning the respondent's right to have an advisor present during the hearing.

g.  A statement that the hearing may go forward if the student fails to appear.

2.  The DO may meet with the student prior to the hearing to assist him/her in preparation.

3.  The Chair will have access to each hearing file before the hearing, and, if he/she determines that a case file is incomplete, he/she may request the Executive Director to remedy any deficiency or to secure additional information or materials.  The respondent and the alleged victim may submit materials to be included in the hearing packet.  For full consideration, materials must be submitted no fewer than three business days prior to the hearing.  Materials submitted prior to the deadline will be included if they are determined to be relevant by the Chair.  The Chair may also at their discretion consider the inclusion of materials that have been submitted late.

4.  A hearing may proceed regardless of the failure of a respondent to appear, as long as the respondent has been properly notified of the hearing at least five business days prior to the hearing.

5.  Hearings will be closed. The Chair may exclude or remove from the hearing room any person who may interfere with the orderly process of the hearing.   An alleged victim of a crime of violence or non-forcible sex offense and their advisor are allowed to be present for all parts of the hearing at which a respondent may be present, with the exception of any discussion of the respondent's disciplinary history.  Witnesses (other than an alleged victim) may be present only while presenting evidence or testimony.

6.  In the event that oral testimony is to be presented, the Executive Director shall invite those witnesses whose presence is deemed appropriate.  The respondent and alleged victim may each suggest potential witnesses to appear on their behalf.  Each must submit a witness list and a description of the nature of each witness's testimony to the Executive Director no fewer than three business days prior to the hearing.  Witnesses are subject to the approval of the Chair.  The Chair may also at their discretion consider the participation of witnesses whose names were not submitted by the deadline.  Character witnesses will only be allowed to present written statements that may be read by the committee in the sanctioning phase. The respondent and the alleged victim are responsible for inviting and notifying any approved witnesses of the date, time, and location of the hearing.

7.  In order to preserve a record for appeal to the Senate Committee on Student Discipline, hearings will be electronically recorded by the subcommittee.  In order to protect the confidentiality of the process and the privacy rights of the individuals involved, other parties will not be permitted to make a separate recording.  If the respondent decides to appeal, he/she can make an appointment to review the recording of the hearing.  The respondent may not make a copy of the recording.  The recording will remain the property of the university.  Recordings of all hearings are subject to destruction after the appeals process has been exhausted.

(ii)   **Procedures at the hearing**.  The Chair will ensure that:

1.  A quorum of five subcommittee members is present. The hearing committee must consist of at least one faculty member and one student. The Chair will count towards quorum. [Special quorum requirements of some subcommittees are noted in the appendices of this document.]

2.  The respondent, alleged victim, and their respective advisors are introduced.

3.  The members of the subcommittee, the Executive Director and/or Disciplinary Officer, and other authorized personnel are introduced.

    a.  The respondent and the alleged victim may challenge the objectivity of any voting member of the hearing committee.  Such a challenge must be based on a prior relationship that may result in substantial bias.

    b.  In the event of such a challenge, the hearing committee will meet in executive session without the challenged member to determine whether the challenged member may continue to serve on the committee.  Following this determination, the hearing will proceed with the remaining members present, and any quorum requirement will be waived.

4.  The record is identified.

    a.  Documentary evidence, statements, and memoranda included in the hearing file are presented.

    b.  Additional information is received or identified.  The committee will determine whether any new information is to be added to to the hearing file, and, if so, whether this addition requires a continuance.

5.  The hearing proceeds in an orderly fashion, as follows:

    a.  The complaint, charges, and any pre-hearing investigation are summarized by the DO.

    b.  The respondent is invited to provide a narrative description of the alleged incident.

    c.  The respondent is asked whether he/she is responsible or not responsible for the alleged charges.  If the respondent agrees that he/she is responsible, the hearing committee may move immediately to sanctioning.

    d.  The alleged victim is invited to provide a narrative description of the alleged incident.

    e.  Witnesses invited by the subcommittee through the Executive Director are escorted into the room one at a time to make statements. The committee may ask questions. When invited to do so, the respondent and the alleged victim may ask questions of the witnesses directed through the Chair.

    f.  If further information is deemed necessary, the subcommittee will suspend its hearing in order to pursue such inquiries and request the Executive Director or the respondent attempt to secure additional information.

    g.  The alleged victim is invited to make a final comment.

    h.  The respondent is invited to make a final comment.

6.  All questions are asked appropriately, in the following manner:

    a.  All witnesses are questioned first by the subcommittee.

b. The respondent and alleged victim are invited to ask questions. In order to preserve civility, all questions asked by the respondent or the alleged victim must be directed through the Chair rather than posed directly to the other party or the witnesses.

(iii) **Deliberations**.

1. The deliberations will proceed as follows:

   a. There will first be a review of testimony, then a determination of the facts and a decision as to whether it is more likely true than not true that the respondent's conduct constitutes a violation of the Student Code.

   b. If a violation is found, the subcommittee may invite statements regarding possible aggravation or mitigation. In addition, the subcommittee will review the respondent's disciplinary history. After this information is provided, the subcommittee will deliberate again in executive session.

   c. The appropriate, authorized actions will be determined.

      i. The subcommittee will consider a formal sanction.

      ii. The subcommittee may also assign educational sanctions.

   d. The decision of the subcommittee will be by a simple majority vote of members present, including the Chair. In the event of a tie vote, the respondent will be found not in violation.

(iv) **Notice of action taken**.

1. If the respondent has waited to hear the outcome, notice will be communicated personally to the respondent by the Chair immediately following deliberations.

2. A letter confirming the actions taken will also be delivered to the respondent. If a sanction is imposed, this letter will include a statement of the respondent's right to appeal to the SCSD within five days from the date that notice of actions taken is transmitted to the student.

3. As permitted by FERPA and the Clery Act, the university will, upon request, disclose to the alleged victim of a crime of violence or a non-forcible sex offense, the results of any disciplinary proceeding conducted by the university against a student who is the alleged perpetrator of such crime or offense. If the alleged victim is deceased as a result of such crime or offense, the next of kin of such victim shall be treated as the alleged victim for purposes of this paragraph.

4. Additional notices and records will be made as required by the nature of the sanction.

**Section 2.04: Actions Possible in Individual Student Discipline Cases**
[Please Note: Actions Possible in Organizational Discipline appear in the appendices to this document].

(a) Actions include, but are not limited to, the following:

(i) **Finding of No Violation**. This action can occur at any stage of the procedure. If a finding of no violation occurs, the student has no disciplinary history. This information will not be considered in future proceedings.

(ii) **Charge(s) Dropped**. This action shall be taken when the DO or the hearing body determines that the student cannot be found in violation of the university's regulations governing student conduct. The behavior may have been unrelated to the rules of conduct, or evidence may be

unobtainable or insufficient, etc.  A dropped charge may be reinstated at the discretion of the Executive Director if substantial new information should become available.  If a charge is reinstated, the respondent will be sent a charge notice.  If a charge is dropped, the student will have no disciplinary history related to it.

(iii)  **Finding of Violation**.  This action occurs when the disciplinary body has established that a policy of the Student Code has been violated based on a preponderance of the information.

(iv)  **Continuance**.  The Executive Director may continue the proceedings when he/she determines it is in the best interest of the university community.  Respondents may appeal a continuance decision to the appropriate committee.

(b)  **Formal Sanction Options**:

(i)  **University Reprimand**.  A University Reprimand indicates that the student's behavior is inappropriate for a member of the academic community.  A University Reprimand is maintained in the student's disciplinary file for one year and would serve as a basis for further sanctioning should subsequent violations occur.  If there are no further violations within that one-year period, the file will be destroyed.  A University Reprimand will not appear on the academic transcript.

(ii)  **University Censure**.  A University Censure is an official communication that a student's behavior is inappropriate for a member of the academic community.  A University Censure is maintained in the student's disciplinary file until the student graduates and would serve as a basis for further sanctioning should subsequent violations occur. A University Censure will not appear on the academic transcript.

(iii)  **Conduct Probation**.  Conduct Probation is a strong communication that a student is no longer in good disciplinary standing with the academic community. Any subsequent violations of the Student Code will be evaluated in the context of the student's probationary status. A record of Conduct Probation is maintained in the office for seven years and is copied to the Dean of the Student's College. Conduct Probation will not appear on the academic transcript and shall be terminated automatically upon graduation.

(iv)  **Suspension**.  Suspension shall be imposed upon a student when the appropriate subcommittee of the SCSD determines that the student's relationship with the university must be suspended from the university for a definite period of time. While suspended, a student may not enroll in, or attend, any courses at the university and may not be awarded a degree from the university. Although a suspended student is not required to petition a subcommittee for permission to return, it is the responsibility of the student to communicate with their college prior to returning and to follow any applicable academic procedures. A copy of the suspension notice will be forwarded to the Dean of the student's college and to the Recorder for a notation on the transcript. Suspension records are maintained indefinitely, but the suspension transcript notation is removed after the period of suspension has expired. At the end of a suspension period, the student is placed on Conduct Probation until graduation, unless mitigating circumstances warrant a different sanction.

(v)  **Dismissal**.  Dismissal shall be imposed upon a student when the appropriate subcommittee or the SCSD determines that the student's relationship with the university must be terminated. While dismissed, a student may not enroll in, or attend, any courses at the university and may not be awarded a degree from the university. After a specified period of time, the dismissed student may petition the appropriate subcommittee for permission to pursue readmission to the university (or, if applicable, the release of their degree). A copy of the dismissal notice will be forwarded to the Dean of the student's college and to the Recorder for a notation on the transcript. Dismissal records are maintained indefinitely, but the dismissal transcript

notation is removed once the student successfully petitions. A successful petition before the subcommittee does not abrogate the right of any dean or director to deny readmission on the basis of scholarship. At such time as the student is readmitted to the university, the student is placed on Conduct Probation until graduation, unless mitigating circumstances warrant a different sanction.

(vi) **Formal Sanction Held in Abeyance**.  In rare cases, the SCSD or an appropriate subcommittee may determine that a certain sanction is the appropriate formal sanction, but strong mitigating circumstances warrant holding the formal sanction in abeyance. The student may continue enrollment under restrictions and conditions. Formal sanctions may only be held in abeyance by the appropriate subcommittee or the SCSD. A student found to have violated the conditions or restrictions of a formal sanction held in abeyance will minimally have the formal sanction imposed. A copy of the notice will be forwarded to the Dean of the Student's College. Formal sanctions held in abeyance shall be terminated automatically upon graduation.

(c) **Other Conditions or Restrictions**

(i) **Other educational sanctions**.  This may include but is not limited to mandated service to the community, educational programs, research and reflective essays, presentations to the community, restitution, letters of apology, or other related discretionary sanctions.

(ii) **Restrictions**.  The student is restricted from certain activities on campus (e.g. participation in certain registered student organizations, intramural or varsity athletics; contact with specific people or physical locations; or other restrictions deemed just and appropriate).

(iii) **Deferral of the degree**.  The Senate Committee, appropriate subcommittee, or the Executive Director may withhold the conferral of the degree until the disciplinary action has been resolved.

(iv) **Revocation of a degree**.  A degree awarded by the institution may be revoked for fraud, misrepresentation, or other violation of the university standards in obtaining a degree, or for other serious violations committed by a student prior to graduation.

(d) **The Senate Committee on Student Discipline may authorize any other sanctions it deems to be just and appropriate**.